UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA JESUS ANELLO,<br>Plaintiff,<br>v.<br>NANCY A. BERRYHILL,<br>Defendant. | Case No. 18-cv-00070-DMR<br><br>**ORDER ON MOTION TO DISMISS FOURTH AMENDED COMPLAINT**<br>Re: Dkt. No. 88 |

Pro se Plaintiff Maria Jesus Anello filed a fourth amended complaint against her former employer, the United States Social Security Administration ("SSA"), alleging claims stemming from her employment and 2011 retirement. [Docket No. 85 (Fourth Am. Compl).] The government now moves to dismiss the fourth amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). [Docket No. 88.] The court held a hearing on January 9, 2020. For the following reasons, the motion is granted in part and denied in part. Ms. Anello's disability discrimination and failure to accommodate claims are dismissed with prejudice.

## I. BACKGROUND

### A. Allegations in the Fourth Amended Complaint

Ms. Anello makes the following allegations in the Fourth Amended Complaint: Ms. Anello started working as a Service Representative ("SR") for the SSA at is Santa Rosa Field Office in August 2001. FAC 2 ¶ 4. After filing for "[Federal Employee Retirement System ("FERS")] disability in July 2011, she "separated from Service" on January 12, 2012. Id. at 2 ¶ 4; 5 ¶ 10.

Ms. Anello describes her job responsibilities as follows:
> The position is one of direct service to the public. SRs screen claimants/beneficiaries who come to the local SSA office for various reasons and either interview them or we refer interviews involving new claims for benefits to a Claims Representative, who interviews

> them. Service Representatives (SRs) take care of post-entitlement actions for these office visitors and those who call the office seeking to have their business taken care of by phone. SRs also open, handle and respond to incoming US mail from beneficiaries[ ] to satisfy claimant requests for information and assistance and review voice mail messages and return those calls.

*Id*. at 2 ¶ 2. She alleges that the "functions of [her] position also included" the following:

> [T]raining my coworkers on the procedures for locking, inspecting, ordering, and mailing the applications for Social Security Cards to Wilkes-Barre Data Center, with required procedures and confirmation. Transferring the earnings from fraudulent Social Security Numbers, to the new and correct SS numbers for individuals with the necessary proofs, following up with the correct procedures, I also corrected records and processed non receipts of benefits, and placed in pay or retained payments for prisoners, with different rules for Disability, Social Security Supplemental Income, or for concurrent benefits.
>
> [ ] This included faxing and calling the different prisons to have beneficiaries placed correctly in pay if released or suspending benefits. I also entered the wages for working beneficiaries so they would not have overpayments or underpayments, documenting and sending back the paperwork with prepaid envelopes. I corrected mistakes with names, birthdates, and gender for SSN applications, and changing the sex in the record, and last names of same sex marriages, among many other things. I followed up with different tasks and processes, and responded promptly to all the requests from different agencies, beneficiaries, coworkers and managers, using all automated programs like Bene Verifications, Wages Earnings, Eview, Mail, Phone messages, Reconsiderations, etc.

*Id*. at 7-8, ¶¶ 15-16.

Ms. Anello alleges that she had a number of "essential job function[s]." First, she alleges that "[t]yping or keyboarding was an essential job function," but that the SR position "is not an intense keyboarding/data entry position" and that "typing for hours at a time was not an essential job function." *Id*. at 2 ¶ 2. According to Ms. Anello, "maybe around 30% of the time I needed to type, mostly entering Social Security numbers." *Id*. at 4 ¶ 6. Other essential functions included "answering the phones, research, filing, printing information for claimants, calculate benefits, working at the front desk, etc." *Id*. at 6 ¶ 13. Ms. Anello also alleges that "[a] key essential job function of the position was knowledge of the entitlement requirements of the programs that SSA administered and knowledge of the software programs used to enter claimant program information onto the system," which "was accomplished through interviews" conducted in person and by

2

telephone. *Id*. at 8 ¶ 17. Additionally, Ms. Anello alleges that the physical requirements of the job were "mainly the ability to type on the computer to enter the customer's SSN to retrieve systems data needed to service and assist the customer." *Id*. According to Ms. Anello, "[t]he SR job required little lifting or carrying." *Id*.[1]

Ms. Anello alleges that when she was hired, she "had the following disabilities: permanent atrial fibrillations, open heart surgery for mitral stenosis, hypothyroidism, and a history of strokes." *Id*. at 2 ¶ 1. On March 30, 2010, she requested a reasonable accommodation of her preexisting heart condition in the form of "turning [her] desk around in the way it was for 9 years, with the recommendation letters of [her] doctors and the support of the Union, months in advance of [an office] remodeling with both desks available at the time." *Id*. at 3. In response, after the desk was "installed facing the wrong direction," Ms. Anello received a "small mirror." *Id*. Ms. Anello alleges that "[t]he mirror was not an effective accommodation for [her] heart condition, as it increased [her] anxiety, and ultimately damaged [her] left fingers, hand, elbow, and neck," and that if she had received her requested accommodation of turning her desk, "[she] would have been able to perform the essential functions of [her] job without undue hardship to the agency, and without getting injured." *Id*.

On August 2, 2010, Ms. Anello "suffered a work related injury 'sprain of left hand/wrist', later developing ramifications to [her] elbow's ulnar nerve, and neck, [and] after months of painful nerve tests, therapies, 86 doctor visits, various medications, which produced terrible secondary effects, on May 26th 2011, [she] was found to have Reflex Sympathetic Dystrophy/Complex Regional Pain Syndrome (RSD/CRPS)." *Id*. at 3 ¶ 2. Ms. Anello's "physical impairment severely limited one or more of [her] major life activities . . ." *Id*. at 4 ¶ 4. She alleges, "sometimes I couldn't drive because of the secondary effects of the medications. I was in constant pain,

---

[1] Ms. Anello attaches a document to the Fourth Amended Complaint that she alleges provides "further clarification about essential job functions of the Service Representative (Contact Representative)." Fourth Am. Compl. 7 ¶ 14, Ex. 2. However, the document, entitled "Social Security Administration, SSA-801—Position Description," is dated July 28, 1993 and appears to be incomplete. The exhibit also contains additional pages that do not appear to be connected to the Position Description. It is not clear whether this exhibit contains a description of Ms. Anello's job duties.

3

sometimes I couldn't be touched, or hugged, the pain was terrible. Other times the pain started without any stimulus; it was in those moments I needed to immediately take some pain medication." *Id*.

Prior to her RSD/CRPS diagnosis, Ms. Anello's doctor provided a work status report on December 27, 2010, "with modified activity for work and home to support a reasonable accommodation of having to rest from strenuously typing every 20 minutes, and hourly 5 minutes rests until 2/28/2011." *Id*. at 4 ¶ 6; Fourth Am. Compl. Ex. 4 (Dec. 27, 2010 Work Status Report). After receiving the December 27, 2010 Work Status Report, which provided for 5-minute breaks every hour, Ms. Anello was able to take her pain medication when needed. She alleges that she "was mostly aware of when [she] was going to have the terrible pain, and for that reason [she] was taking [her] medication every hour and a half, marking it in [her] calendar." Fourth Am. Compl. 4 ¶ 6. Other times "the terrible causalgia pain [would] not follow a pattern," and "would get worst with the stress, the tension, the irrational demands from management that wouldn't let [her] finish [her] job." *Id*. Ms. Anello had to ask to take leave, sometimes unpaid, if she "had extreme causalgia pain, or bloating of [her] left arm." *Id*. at 5 ¶ 8.

Ms. Anello received three additional Work Status Reports with restrictions. On May 26, 2011, Ms. Anello's physicians provided revised restrictions that limited her as follows:

- Repetitive left hand motions continuously no more than 20 minute(s) at one time, for no more than 40 cumulative minutes per hour.
- Gripping/grasping left hand continuously no more than 5 minute(s) at one time, for no more than 20 cumulative minutes per hour.
- Lift/carry no more than 5 pounds.

*Id*. at 5 ¶ 10; Fourth Am. Compl. Ex. 6 at 1 (May 26, 2011 Work Status Report). She received revised restrictions on June 28, 2011 that further limited repetitive motions with her left hand, gripping/grasping, and lifting/carrying, as follows:

- Repetitive left hand motions continuously no more than 5 minute(s) at one time, for no more than 15 cumulative minutes per hour.
- Gripping/grasping left hand continuously no more than 1 minute(s) at one time.
- Lift/carry no more than 2 pounds.

Fourth Am. Compl. Ex. 6 at 2 (June 28, 2011 Work Status Report). She received a final set of

4

restrictions on June 29, 2011 which stated that she was "placed on modified activity at work and at home from 6/29/2011 through 9/30/2011" and that limited motions for both hands:

- Repetitive right hand motions continuously no more than 10 minute(s) at one time, for no more than 30 cumulative minutes per hour.
- Repetitive left hand motions continuously no more than 5 minute(s) at one time, for no more than 15 cumulative minutes per hour.
- Gripping/grasping right hand continuously no more than 5 minute(s) at one time, for no more than 15 cumulative minutes per hour.
- Gripping/grasping left hand continuously no more than 1 minute(s) at one time.
- Lift/carry no more than 5 pounds.

Fourth Am. Compl. Ex. 6 at 3 (June 29, 2011 Work Status Report). Additionally, the June 29, 2011 Work Status Report provided the following:
Other needs and/or restrictions:

gripping and grasping needs to be limited for BOTH hands to what patient can tolerate, up to 1-2 minutes at a time for the LEFT, and up to 5 minutes at a time for the RIGHT.

Likewise, keyboarding, mousing, and other repetitive hand motions needs to be limited for BOTH hands to what she can tolerate, up to 5 minutes at a time for the LEFT and up to 10 minutes for the RIGHT.

*Id.*

Ms. Anello alleges that she also requested as a reasonable accommodation "some intervals of time away for taking my pain medication," including "a break to take [her] pain medication every 90 minutes if needed . . ." Fourth Am. Compl. 6 ¶¶ 12-13. According to Ms. Anello, "the timing of [her] medication was not like clockwork, it depended on many variables, like the amount and frequency of computer keying, the stress or the harassment." *Id.* at 6 ¶ 13. Ms. Anello also alleges that she "had short respite times to perform other essential functions like answering the phones, research, filing, printing information for claimants, calculate benefits, working at the front desk, etc." *Id.*

Ms. Anello alleges that SSA "refused to accept [her] requested accommodation" (*id.* at 5 ¶ 11) and "denied the reasonable accommodation that [her] Occupational physician recommended" in the work status reports (*id.* at 6 ¶ 12), i.e., the limitations on gripping, grasping, keyboarding, mousing, and other repetitive hand motions. *See* Fourth Am. Compl. Ex. 6. Ms. Anello alleges

5

that SSA "demanded that [she] produce additional medical documentation" that "went beyond what [she] was asking for," "which effectively disregarded [her] accommodation request," and then "claimed [she] could not be accommodated." *Id.* at 5-6 ¶ 11. She alleges that these "demands for medical documentation [were] intended . . . to force [her] out of employment rather than accommodate [her], thus discriminating against [her] for being disabled." *Id.*

Ms. Anello alleges that she was "'otherwise qualified for employment' and able to perform the essential functions of [her] position" "with or without accommodation." *Id*. at 5 ¶ 9, 7 ¶ 14. She alleges "the reasonable accommodation that [her] Occupational physician recommended . . . would not have caused undue hardship to the agency," and that she "would have been able to perform the essential functions of [her] position as [she] had been doing from 5/26/2011 until 6/29/2011," the last day she worked. *Id*. 6 at ¶ 12. She further alleges that "[t]here were many other essential job duties that could have been assigned to [her] that would have allowed [her] to continue working there." *Id*. at 7 ¶ 13. She does not identify those "other essential job duties." *See id*.

Ms. Anello further alleges that she was subject to a hostile work environment, which she describes as follows:

> The harassment that I received was prohibited discrimination due to my disability, including physical intimidation and extreme hostility by Assistant Manager Paul Sampson, and created a Hostile Work Environment. After obstructing my application for Workers Compensation, for VLTP, cheating on my VLTP[.]
>
> [ ] [Sampson] is a large and imposing man and he would be really derogative, he physically blocked me on June 27th 2011, when I was trying to get to my desk for pain medication, his interception caused me more pain, and I was crying in pain, blocked me a second time when I tried to get permission from another manager, then he mocked me when my Supervisor arrived, telling Lupita Dean: 'there she is . . . crying again'. . . . His discriminatory attitude towards me included physical posturing, increased volume and harsh tone of voice, the making of facial expressions, he would glower and look down at me and physically intimidated me. Paul's face would contort when talking to me, and with hostility, he would scowl at me. Mr. Sampson told me that I was never going to be promoted while he was at the Santa Rosa District Office. He wrote on my SF-50 that the agency would appeal any award of unemployment compensation benefits, refused to cancel my 'Voluntary Retirement' even after receiving a letter from Chief Executive, President Obama . . . and OPM confirming the annulment, voidance, and repeal of the Voluntary Retirement. . . .

> Mr. Sampson blocked my Reasonable Accommodation request to have my desk changed to a position recommended by ADA, I was seeing the problem happening and tried to fix it. Refusing to process my Workers Compensation claim, Voluntary Leave Transfer Program request, Family Leave, Sick Leave, Advance Sick Leave, Social Security Human Resources management . . . .

*Id*. at 8-10, ¶¶ 1-3, 5. According to Ms. Anello, Sampson; her manager Lupita Dean; Marv Mueller, District Manager; and the people in Human Resources "were all into getting rid of [her] because [she] is disabled . . ." *Id*. at 11 ¶ 15.

Ms. Anello alleges that on July 11, 2011, she was "constructively discharged by being forced to apply for FERS Disability/Retirement as a result of [her] supervisor's failure to support and approve [her] reasonable accommodation requests and requests for participation in the VLTP; while sending claims to Workers Compensation and FERS Disability falsely establishing that [she] was not disabled and needing Reasonable Accommodations." *Id*. at 13-14 ¶ 3.

Based on these allegations, Ms. Anello appears to bring the following claims for relief: 1) discrimination based on disability; 2) failure to accommodate her disability, based on the denials of her requests to change the position of her desk and otherwise "failing to accommodate [her]"; 3) and hostile work environment/harassment based on disability. Fourth Am. Compl. 1 ("This fourth amended complaint addresses" "disability discrimination, failure to accommodate and hostile work environment.") 12 (listing claims).

### B. Procedural History

On November 20, 2017, Ms. Anello filed a complaint which did not formally plead individual claims for relief but in which she alleged that she suffered discrimination and retaliation during her employment by the SSA. The court liberally construed the complaint to allege claims for 1) disability discrimination; 2) failure to accommodate disability; 3) employment discrimination based on national origin (Spanish); and 4) retaliation.

The government moved to dismiss the complaint. Following a hearing on August 9, 2018, the court granted the motion and dismissed the complaint. *Anello v. Berryhill*, No. 18-cv-00070-DMR, 2018 WL 3845617 (Aug. 13, 2018). The court granted Ms. Anello leave to file an amended complaint by September 4, 2018 alleging claims for disability discrimination, failure to

accommodate disability, national origin disability, retaliation, and age discrimination. *Id*. at *4-6. The court dismissed any claim under the Federal Employees' Compensation Act for lack of subject matter jurisdiction. *Id*. at *6-7.

Ms. Anello filed a first amended complaint ("FAC") on September 5, 2018, and the government moved to dismiss. On January 22, 2019, the court granted the motion. *Anello v. Berryhill*, No. 18-cv-00070-DMR, 2019 WL 285197 (N.D. Cal. Jan. 22, 2019) ("*Anello II*"). The court dismissed with prejudice claims that exceeded the scope of Ms. Anello's EEO proceedings for lack of subject matter jurisdiction. These included Ms. Anello's claims that management demanded that her doctor impose further medical restrictions and that SSA forged her retirement application, and claims based on alleged harms Ms. Anello experienced after the EEO proceedings. *Id*. at *7-8.

The court also dismissed the following claims under Rule 12(b)(6) with leave to amend: disability discrimination, failure to accommodate Ms. Anello's disability, harassment/hostile work environment based on disability, and violation of the Administrative Procedure Act. *Id*. at *9-12. The court granted Ms. Anello "one final opportunity to amend her complaint to state a claim." *Id*. at *12.

Ms. Anello timely a second amended complaint ("SAC") on February 22, 2019 and the government again moved to dismiss. On May 20, 2019, after the parties had fully briefed the motion, the court vacated the hearing pursuant to Civil Local Rule 7-1(b). The following day, Ms. Anello filed a motion requesting leave to file a response to Defendant's reply brief, in which she stated that she had visited the court's Legal Help Center seeking "legal advice on how to cure any defects in [her] claim," and that she had been prepared to offer additional argument and facts in support of the SAC at the subsequently vacated hearing on the motion to dismiss. As Ms. Anello described facts in her motion for leave to file a response that had not been alleged in previous versions of her complaint or any other filing, the court denied Defendant's motion to dismiss the SAC without prejudice and granted Ms. Anello "**one final opportunity to plead her best case in a third amended complaint that includes all relevant facts supporting her claims.**" [Docket No. 72 (emphasis in original).] The court further ordered that "Plaintiff may not refer to or

1 incorporate by reference any prior filings and may not re-plead any claims that have been
2 dismissed with prejudice." *Id*. (citing *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012)
3 ("For claims dismissed with prejudice and without leave to amend, we will not require that they be
4 repled in a subsequent amended complaint to preserve them for appeal.")).

Ms. Anello timely filed a third amended complaint and the government moved to dismiss. On August 30, 2019, the court granted the motion. *Anello v. Berryhill*, No. 18-CV-00070-DMR, 2019 WL 4141928 (N.D. Cal. Aug. 30, 2019) ("*Anello III*"). The court dismissed with prejudice Ms. Anello's claims for discrimination based on national origin and retaliation. *Id*. at *6, 10. The court dismissed her claims for disability discrimination, failure to accommodate Ms. Anello's disability, and hostile work environment/harassment based on disability with leave to amend. *Id*. at *8-10. The court granted Ms. Anello "leave to file a **fourth and last** amended complaint alleging those claims" and warned that "[n]o further amendments will be permitted." *Id*. at *1.

Ms. Anello timely filed the Fourth Amended Complaint. The government again moves to dismiss.

## II. LEGAL STANDARDS

The government moves to dismiss the Fourth Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged

9

must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(1). The challenging party may make a facial or factual attack challenging subject matter jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In contrast, a factual attack disputes "the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. at 1039. A factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations." *White*, 227 F.3d at 1242 (citation omitted). Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations omitted).

Pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94. The Ninth Circuit has held that "where the petitioner is pro se," courts have an obligation, "particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt." *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc). "However, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska,* 673 F.2d 266, 268 (9th Cir. 1982).

## III. DISCUSSION

### A. Realleged Claims Previously Dismissed With Prejudice

The court previously dismissed with prejudice claims that exceeded the scope of Ms. Anello's EEO proceedings, including Ms. Anello's claims that management demanded that her doctor impose further medical restrictions and that SSA forged her retirement application. *Anello II*, 2019 WL 285197, at *7-8. In the Fourth Amended Complaint, Ms. Anello reasserts these allegations. Fourth Am. Compl. 5-6 ¶ 11, 14 ¶ 9. Claims based on these allegations are again dismissed with prejudice pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, as they exceed the scope of the EEO proceedings. *Anello II*, 2019 WL 285197 at *7-8.

### B. Motion to Dismiss for Failure to State a Claim

In the Fourth Amended Complaint, Ms. Anello alleges claims under the Rehabilitation Act for disability discrimination, failure to provide reasonable accommodation, and hostile work environment/harassment based on disability.

The Rehabilitation Act, 29 U.S.C. § 791, provides the exclusive remedy for federal employees alleging disability discrimination. *Johnston v. Horne,* 875 F.2d 1415, 1420 (9th Cir.1989), *overruled on other grounds by Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89 (1990). Courts use the standards applied under the Americans with Disabilities Act ("ADA") to determine whether a violation of the Rehabilitation Act occurred in the federal employment context. *Lopez v. Johnson,* 333 F.3d 959, 961 (9th Cir. 2003) ("Section 501 borrows its substantive standards from the Americans with Disabilities Act (ADA)." (citing 29 U.S.C. § 791(g)); *see also Coons v. Sec'y of the U.S. Dept. of* Treasury, 383 F.3d 879, 884 (9th Cir. 2004) ("The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act").

#### 1. Disability Discrimination

In order to state a disability discrimination claim under the Rehabilitation Act, a plaintiff must allege that "(1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. U.S. Marshals*

*Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). For purposes of the Rehabilitation Act, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment." *Id*. (citing 42 U.S.C. § 12102(2)).

The court has dismissed Ms. Anello's disability discrimination claim three times for failure to sufficiently and plausibly allege that she is "otherwise qualified for employment." *Anello*, 2018 WL 3845617, at *5; *Anello II*, 2019 WL 285197, at *9-10; *Anello III*, 2019 4141928, at *7-8. A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Bates v. United Parcel Serv.*, 511 F.3d 974, 989 (9th Cir. 2007) (emphasis in original) (quoting 42 U.S.C. § 12111(8)). "'Essential functions' are 'fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position.'" *Id*. (quoting 29 C.F.R. § 1630.2(n)(1)). "Even when a disabled employee cannot perform the essential functions of her job unassisted, she can still be qualified for the position if she could accomplish its essential functions 'with . . . reasonable accommodation.'" *Brown v. Potter*, 457 Fed. Appx. 668, 670 (9th Cir. 2011) (quoting 42 U.S.C. § 12111(8)). "Reasonable accommodations" are "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

In order to determine whether a plaintiff is a qualified individual, "[t]he court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position. The court then considers whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation." *Bates*, 511 F.3d at 990 (citations omitted).

The court previously held that the first amended complaint "[did] not sufficiently identify the essential functions of the position that Ms. Anello held" or "allege that Ms. Anello could perform those functions with or without a reasonable accommodation." *Anello II*, 2019 WL

12

285197, at *9. In dismissing the third amended complaint, the court concluded that the allegations were still "insufficient to plead that Ms. Anello was a qualified individual because they [did] not provide enough detail about the essential functions of the position that appear to be at issue in this case." *Anello III*, 2019 WL 4141928, at *7. In essence, Ms. Anello's disability claims raised issues about plausibility, for although she alleged that she could perform the essential functions of her job, she did not explain what they were. This raised a question of plausibility because her allegations suggest that her job entailed significant computer work, but the medical limitations on use of her hands were fairly significant. The court explained this point in detail as follows:

> In particular, as the court discussed in its order dismissing the FAC, "although the FAC contains numerous allegations about Ms. Anello's physical condition and limitations, it omits any discussion of the physical requirements of the Service Representative position. . . . [the] allegations suggest that Ms. Anello's supervisors expected her to type and/or use a computer to carry out her job duties, [but] the FAC is silent as to any physical requirements of the Service Representative position, and silent about whether she could perform any of physical requirements of the job with or without a reasonable accommodation." *Anello II*, 2019 WL 285197, at *9.
>
> The TAC fails to provide any additional details about the physical requirements of the Service Representative position and Ms. Anello's ability to perform them, with or without a reasonable accommodation. Ms. Anello's August 2010 injury that resulted in her developing Reflex Sympathetic Dystrophy/Complex Regional Pain Sydrome was the sprain of her left hand and wrist. Ms. Anello previously submitted to the court copies of "Work Status Reports" from her physician detailing her work restrictions in May and June 2011. While it is not clear which contained Ms. Anello's operative work restrictions, each appears to significantly limit Ms. Anello's use of her left hand (or both hands) and ability to perform repetitive hand motions. However, several of the "essential functions" identified in the TAC appear to involve physical tasks that require the use of her hands, including performing repetitive hand motions, such as using a computer, using a fax machine, and sending mail, but Ms. Anello does not allege how much time was spent performing these functions or that she could perform the physical requirements of these tasks with or without a reasonable accommodation.

*Anello III*, 2019 WL 4141928, at *7 (internal citation omitted). Although not described in detail in that order, the work restrictions on her hands as set forth above included limits of 5 minutes of repetitive motion with her left hand, for no more than 15 minutes per hour. The restrictions on her right hand were only slightly less restrictive. She had similarly restrictive limits on gripping, grasping, mousing, keyboarding and lifting.

13

The Fourth Amended Complaint adds additional details about Ms. Anello's job duties. She explains that as a Service Representative, she provided "direct service to the public," which included interviewing claimants in person and by telephone, handling and responding to mail from beneficiaries, listening to voicemails and returning phone calls, training coworkers on required procedures, correcting records, processing "non receipts of benefits," faxing and calling prisons regarding beneficiaries, "enter[ing] wages," handling paperwork, correcting mistakes in records, and using automated programs to enter information into the system. *See* Fourth Am. Compl. 2 ¶ 2, 7-8 ¶¶ 15-16. Other job duties included "answering the phones, research, filing, printing information for claimants, calculat[ing] benefits, [and] working at the front desk . . ." *Id*. at 6 ¶ 13. The Fourth Amended Complaint also includes allegations about the amount of time Ms. Anello spent performing certain hand motions. Specifically, Ms. Anello admits that "[t]yping or keyboarding was an essential job function" but denies that "typing for hours at a time" was an essential job function, estimating that "maybe around 30% of the time [she] needed to type." Fourth Am. Compl. 2 ¶ 2, 4 ¶ 6. She also alleges that her position "required little lifting or carrying." *Id*. at 8 ¶ 17. These are the only allegations in the Fourth Amended Complaint about the physical requirements of Ms. Anello's essential job functions.

These allegations remain insufficient and continue to raise a red flag regarding plausibility. Ms. Anello now states that she had to type 30% of the time. It does not appear plausible that Ms. Anello could have satisfied the essential job function of typing or keyboarding for 30% of her workday given the severity of the restrictions in her June 29, 2011 final Work Status Report. She alleges only that "typing for hours at a time was not an essential job function," but does not allege how long she was required to type continuously. The final Work Status Report dated June 29, 2011 specified that Ms. Anello was limited to no more than 5 minutes at a time and 15 cumulative minutes per hour of repetitive left hand motions, and no more than 10 minutes at a time and 30 cumulative minutes per hour of repetitive right hand motions. Fourth Am. Compl. Ex. 6 at 3. Given these severe limitations, this alone raises a red flag about the plausibility of her allegation that she could perform the essential functions of her job.

Moreover, the Fourth Amended Complaint does not allege the physical requirements for

14

the tasks that occupied the remaining 70% of her time. Many if not most of Ms. Anello's job functions appear to require physical actions such as repetitive hand motions, computer-related tasks such as mousing, and gripping and grasping. Such tasks include conducting research, filing and printing information, handling incoming and outgoing mail, using automated programs to enter information into the system, processing requests and applications, answering telephones, and interviewing claimants by telephone. However, Ms. Anello's restrictions for the movements that were likely required to perform these tasks were significant.

Specifically, in her final Work Status Report, Ms. Anello was restricted to no more than 1 minute at a time of continuous gripping and grasping with her left hand and up to 5 minutes at a time of continuous gripping and grasping with her right hand. She was also restricted to no more than 5 minutes of continuous repetitive left hand motions and no more than 10 minutes of continuous repetitive right hand motions. Fourth Am. Compl. Ex. 6 at 3. Given these restrictions, and in the absence of information about the physical requirements for tasks that occupied the 70% of her time that was not spent typing, the court concludes that Ms. Anello has not plausibly alleged that she could have performed any essential functions of her position that involved gripping, grasping, or continuous repetitive motions.

In fact, Ms. Anello appears to concede that she could not perform the essential functions of her position, because she alleges that "[t]here were many other essential job duties that could have been assigned to [her] that would have allowed [her] to continue working there," without identifying those essential job duties. Fourth Am. Compl. 7 ¶ 13.

In sum, the court concludes that the allegations in the Fourth Amended Complaint are insufficient to plausibly allege that Ms. Anello could have performed the essential functions of her position as a Service Representative with or without a reasonable accommodation. Accordingly, the Fourth Amended Complaint does not sufficiently allege that she was a qualified individual, and her disability discrimination claim must be dismissed. As discussed, the court has given Ms. Anello numerous opportunities to amend the complaint to state a disability discrimination claim, and previously explained that her earlier pleadings failed to sufficiently allege details "about the physical requirements of the Service Representative position and Ms. Anello's ability to perform

them, with or without a reasonable accommodation." *See Anello III*, 2019 WL 4141928, at *7-8. Given her repeated failures to cure this deficiency, Ms. Anello's disability discrimination claim is dismissed with prejudice.

### 2. Failure to Accommodate

Ms. Anello next alleges that the SSA failed to accommodate her disability. In order to state a claim under the Rehabilitation Act for failure to accommodate a disability, a plaintiff must show that (1) she is disabled; (2) she is a qualified individual, meaning that she could meet the essential requirements of the position with or without reasonable accommodation; and (3) a reasonable accommodation is possible. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999); *Buckingham v. United States*, 998 F.2d 735, 739-40 (9th Cir. 1993). A "reasonable accommodation" is defined as "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Ms. Anello's claim for failure to accommodate her disability is based upon the denial of her request to change the configuration of her desk. It also appears to be based on the SSA's refusal to accommodate her work restrictions, including providing breaks to take pain medication as needed. *See* Fourth Am. Compl. 12. This claim remains insufficiently pleaded for the same reasons as her disability discrimination claim—namely, Ms. Anello has failed to plead that she is a qualified individual with a disability, as discussed above. As Ms. Anello has been given numerous opportunities to state a claim for failure to accommodate, the claim is dismissed with prejudice.

### 3. Harassment/Hostile Work Environment

Finally, the Fourth Amended Complaint alleges a claim for harassment/hostile work environment based on Ms. Anello's disability. Fourth Am. Compl. 12.

As the court previously explained, the Ninth Circuit has not decided whether a hostile work environment claim exists under the ADA, and it is not clear whether such a claim exists under the Rehabilitation Act. *See Garity v. APWU Nat'l Labor Org.*, 655 Fed. Appx. 523, 523-25

16

(9th Cir. 2016) ("[a]ssuming without deciding that [a hostile work environment claim under the ADA] exists in this circuit, and that we would apply Title VII law to analyze it . . ." (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003) and *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006)). Other circuits have held that claims of disability-based harassment are cognizable. *See, e.g.*, *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-236 (5th Cir. 2001); *Lanman v. Johnson Cty., Kansas*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 720-22 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175-76 (4th Cir. 2001). The Fifth Circuit states that in order to prove a claim of disability-based harassment, the plaintiff must prove the following five elements:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Flowers*, 247 F.3d at 235-36 (modeling a claim for disability-based harassment after the similar claim under Title VII (citations omitted)). "[T]he disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Id.* at 236 (quotation and citation omitted). Factors that bear on whether a work environment is "abusive" include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation and citation omitted).[2]

---

[2] Defendant argues that Ms. Anello must adequately plead that she was a qualified individual with a disability in order to establish that she belonged to a protected group, but it is not clear whether a plaintiff claiming disability-based harassment must establish that she is a qualified individual with a disability. *Flowers* did not address the question and does not appear to impose such a requirement. Defendant cites *Ellis v. Donohoe*, No. 4:13-CV-238 CDP, 2014 WL 7335161, at *6 (E.D. Mo. Dec. 19, 2014), in which the court listed the elements of a "discriminatory harassment" claim, including the requirement that a plaintiff establish that "she was a member of a protected group (or in the case of disability discrimination, that she was a qualified individual with a disability)." However, none of the Eighth Circuit cases cited by the court in *Ellis* set forth such a requirement. *See, e.g., Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010). Defendant also cites *Maldonado v. Cooperativa De Ahorro*, 685 F. Supp. 2d 264, 274 (D.P.R. 2010), in which the court granted summary judgment on the plaintiff's disability-based harassment claim on the basis that he "does not belong to a protected group inasmuch as he

In its order dismissing the FAC, the court held that "[a]ssuming without deciding that such a claim exists and that the Ninth Circuit would adopt a test for a disability-based harassment claim that is similar to the one articulated by the Fifth Circuit, . . . Ms. Anello has failed to allege a claim for harassment based on disability." *Anello II*, 2019 WL 285197, at *11 (citation omitted). Specifically, the court found that "the FAC does not allege facts to show that the alleged disability-based harassment Ms. Anello experienced was sufficiently pervasive or severe enough to alter the conditions of her employment." *Id*. The court subsequently held that Ms. Anello's subsequent pleading, the TAC, plausibly alleged conduct that was sufficiently severe or pervasive to alter the conditions of her employment but failed to state a claim for harassment/hostile work environment based on disability "because it [did] not allege that [Assistant District Manager] Sampson's conduct was 'based on [Ms. Anello's] disability or disabilities.'" *Anello III*, 2019 WL 4141928, at *9 (quoting *Flowers*, 247 F.3d at 235-36). Further, the TAC did not allege that the SSA "knew or should have known of the harassment and failed to take prompt, remedial action." *Id*. (citing *Flowers*, 247 F.3d at 235-36).

The Fourth Amended Complaint repeats Ms. Anello's allegations about Sampson's conduct, including Sampson physically blocking Ms. Anello from getting to her desk for pain medication, blocking her a second time when she tried to get permission to get her medication from another manager, and mocking her for "crying again," as well as Sampson's "physical posturing, increased volume and tone of voice," and "glower[ing]," "look[ing] down," and "physically intimidat[ing]" Ms. Anello. *See* Fourth Am. Compl. 8-10, ¶¶ 1-3, 5. These allegations plausibly allege conduct that was sufficiently severe or pervasive to alter the conditions of Ms. Anello's employment.

---

is not a qualified individual with a disability under ADA." However, the court did not analyze the issue and concluded that the plaintiff did not belong to a protected group because he had failed to establish that he was disabled within the meaning of the ADA. *Id*. at 273-74 (holding "Plaintiff here has failed to identify a life activity limited by his impairment that qualifies as major" and noting lack of evidence that the plaintiff "was substantially limited with regards to driving or any other major life activity"). Here, Defendant does not challenge Ms. Anello's allegation that she was a person with a disability. On the current record, the court declines to hold that Ms. Anello must allege that she is a "qualified individual with a disability" in order to plead that she "belong[ed] to a protected group" and thus state a claim for disability-based harassment.

Further, the Fourth Amended Complaint remedies the deficiencies identified in the TAC. The Fourth Amended Complaint alleges that "[t]he harassment that [Ms. Anello] received was prohibited discrimination due to [her] disability." Fourth Am. Compl. 8 ¶ 1. The court concludes that the allegations about Sampson's conduct in the Fourth Amended Complaint support a reasonable inference that his actions were motivated by Ms. Anello's medical conditions, as his alleged behavior was related to her attempts to obtain pain medication for those conditions, including "mock[ing]" her for crying in pain.

Finally, the Fourth Amended Complaint also sufficiently alleges that the SSA knew or should have known of Sampson's alleged harassment and failed to take prompt, remedial action. In the Title VII context, "[a]n employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004) (citing *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001)). "An employer is vicariously liable for a hostile environment created by a supervisor, although such liability is subject to an affirmative defense." *Id*. (citations omitted). "A supervisor is a person who can take tangible employment actions against an employee, including effecting 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 689 (9th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013)). Here, Ms. Anello alleges that Sampson was the Assistant District Manager and the "second in command" in her office. Fourth Am. Compl. 2 ¶ 5. She also alleges that he told her that she "was never going to be promoted while he was at the Santa Rosa District Office," informed her that SSA would appeal any award of unemployment benefits, refused to cancel her retirement, and "blocked [her] Reasonable Accommodation request to have [her] desk changed." *Id*. at 10 ¶¶ 3, 5. These allegations support the inference that Sampson could "take tangible employment actions against" Ms. Anello, rendering the SSA vicariously liable for Sampson's alleged harassment.

**IV. CONCLUSION**

Ms. Anello's claims for disability discrimination and failure to accommodate are dismissed

19

with prejudice. Defendant's motion to dismiss the harassment/hostile work environment claim based on disability is denied.

The court will hold an initial case management conference on March 18, 2020. A joint case management statement is due by March 11, 2020.

**IT IS SO ORDERED.**

Dated: January 13, 2020



Donna M. Ryu
United States Magistrate Judge